Daniel v. Coal & Iron Co.

J. L. DANIEL *et al.* *v.* DAYTON COAL & IRON CO., LIMITED.

(*Knoxville.* September Term, 1915.)

1. **PUBLIC LANDS.** Transfer of land grant. Registration. Presumption.

Where a copy of what appeared to be a registration of an original land grant was introduced in evidence in ejectment, and immediately following it appeared a transfer executed by the grantee of the land therein described, the position of the transfer on the registration book following the grant indicated that it was a transfer of the land written on the back of the original grant. (*Post, p.* 504.)

Case cited and approved: De Garmo v. Prater, 125 Tenn., 497.

2. **ACKNOWLEDGMENT.** Defects. Cure by registration deeds.

Under Shannon's Code, secs. 3761, 3762, relating, respectively, to presumptions on registration twenty years old and on registration thirty years old, the fact that a deed had been registered since December 24, 1834, cured any defects in the acknowledgment thereof. (*Post, pp.* 504, 505.)

Code cited and construed: Secs. 3761, 3762 (S.).

3. **PUBLIC LANDS.** Registration. Transfer of land grant.

Where the custom then in force required that grants of land from the State be recorded by the register of the land office before delivery to the grantees, a grant had necessarily been recorded prior to January 23, 1833, when a transfer thereof was indorsed on the back of the grant; and hence a notation appearing on the record, reading "Registered December 24, 1834," necessarily referred to the registration of the transfer, rather than of the grant. (*Post, pp.* 505, 506.)

4. **ESTOPPEL.** Provisions of will. Ejectment.

A provision of a will bequeathing to testator's children "the proceeds of the sale of land in Tennessee lately bought by me

that may. remain there and uncollected at the time of my decease," and a provision of a codicil stating that "respecting Tennessee lands I refer solely to the unpaid purchase money," were too uncertain to establish a conveyance of the land, or to estop the heirs from asserting title in ejectment, especially where the lands in controversy were bought by testator twenty-four years before execution of the will, and the evidence was not conclusive whether testator owned other lands in Tennessee. (*Post, pp.* 506, 507.)

5. **FRAUDS, STATUTE OF.** Parol sale. Renunciation. Ejectment.

The action of the vendor's heirs in bringing ejectment for the land is a sufficient renunciation of a parol voidable sale thereof. (*Post, p.* 507.)

Case cited and approved:   Vaughn v. Vaughn, 100 Tenn., 285.

6. **ESTOPPEL.** Elements. Recitals of will. Ejectment.

A recital in a will that testator owns no lands in the State will not estop his heirs from asserting title to lands as having belonged to him, where defendant has in no way acted on such recitals.   (*Post, pp.* 507, 508.)

Cases cited and approved:   Smith v. Cross, 125 Tenn., 159; Tate v. Tate, 126 Tenn., 171.

7. **EJECTMENT.** Right of action. Parties. Power of sale.

A provision of a will authorizing testator's executors to sell and convey his realty, being but a power of sale, did not vest title in his executors, so as to preclude his heirs from suing to recover the land.   (*Post, pp.* 508, 509.)

Case cited and distinguished:   Rogers v. Marker, 59 Tenn., 645.

8. **ADVERSE POSSESSION.** Use and occupation. Sufficiency.

The maintaining for more than seven years of a small pen in the woods, about thirty-five by forty feet, which was never cleared or cultivated, being a mere illusory possession, from which the owner might reasonably conclude that there was no intention to claim title, was not such a use and occupation as would give title to a large tract of land under the statute

Daniel v. Coal & Iron Co.

of limitations; it being essential that the use be such as the land is reasonably susceptible of, and that it be obvious, open, and notorious, and indicate an intention to use the land as owner. (*Post, pp.* 509, 510.)

Cases cited and approved: King v. Mabry, 71 Tenn., 241; Coal Co. v. Coppinger, 95 Tenn., 526.

9. **ADVERSE POSSESSION.** Use and occupation. Inclosure. Title in defendant by adverse possession could not be predicated on a possession within the boundary of a tract of land owned by defendant and interlapping the land in controversy, where defendant's inclosure was not within the interlap. (*Post, p.* 510.)

10. **ADVERSE POSSESSION.** Possession within interlap. Superior title.
A possession within such interlap, but on a tract of land to which there was a title superior to that under which plaintiff claimed, could not be adverse to plaintiff's title. (*Post, p.* 510.)

11. **ADVERSE POSSESSION.** Possession by third person. Sufficiency of evidence.
Evidence in ejectment, wherein defendant company claimed title by adverse possession, *held* not to show that the possession of a third person was held and claimed as a possession for defendant for a sufficient length of time to vest title in defendant. (*Post, pp.* 510-512.)

---

FROM RHEA.

---

Appeal from the Chancery Court of Rhea County.— JAMES M. TRIMBLE, Special Chancellor.

MILLER & SWAFFORD, for appellant.

J. L. DANIEL, J. L. GODSEY and SPEARS & LYNCH, for appellees.

MR. JUSTICE FANCHER delivered the opinion of the Court.

This is an action of ejectment. Complainants are the heirs and devisees of Appollos Woodward, and sue to recover 5,000 acres of land embraced in grant No. 2751, issued by the State of Tennessee to Jeremiah Church, November 19, 1832, calling to lie in Bledsoe county, Tenn., but in reality also situated party in Rhea county. Complainants introduced as evidence a copy of this grant from the books of the land office where the original was registered, and next a copy from the register's office of Bledsoe county of what appears to be a registration of the original grant, and immediately following it appears a transfer executed by Jeremiah Church to Appollos Woodward, January 23, 1833, of the land within described. Its position on the registration book following the grant indicates that it was a transfer of the land written upon the back of the original grant. *De Garmo* v. *Prater,* 125 Tenn., 497, 146 S. W., 144, Ann. Cas., 1913C, 346. No objection appears to have been made at the time this instrument was offered in evidence, but it is now insisted that the instrument is not sufficiently verified to operate as a conveyance of land, because it is not acknowledged or proven in accordance with the laws of Tennessee; the acknowledgment being defective.

Without going into the law in force at that time, to see if the acknowledgment was in proper form, we find that the deed has been registered since December 24,

1834, in the proper county, and this cures any defect that may exist. Shannon's Code, secs. 3761, 3762.

It is stated by defendant that there is nothing to show when the transfer was registered, and that the notation appearing on the record, "Registered December 24, 1834," refers to a registration by R. Nelson, register of the land office where the grant was recorded, and is a notation of the date of the registration of the grant and not of the deed. This cannot be true. According to the custom then in force, the grant was made out from the plat and certificate of survey, and transmitted from the land office to the governor and secretary of State, where it was executed by the governor and attested by the secretary of State, attaching the great seal of the State, and was then returned to the register of the land office and by him recorded, and then turned over to the grantee or some person for him.

We must conclude that this grant had come to the hands of Jeremiah Church when this assignment or transfer was made, from the fact that it was evidently written on the back of the grant. We must therefore conclude that the grant had been recorded by R. Nelson, register of the Mountain district, prior to January 23, 1833, when the transfer was made on the back of the grant. The notation of R. Nelson does not show the date, but shows the book and page where registered. Immediately following the notation of R. Nelson, is found the further notation: "Registered December 24, 1834." This last notation was evidently the date of

the registration of the deed indorsed by the register of deeds at Pikeville, and was probably written on the back of the grant following the notation of R. Nelson.

Another question presented by the defendant is that Appollos Woodward in his will and codicil thereto shows that he had previously conveyed this land. The will contains the folowing sections:

"XIII.  I give and bequeath to my children, to wit, Peter V. Woodward, Mary W. Grafius, Jno. V. Woodward, Margaret H. Covert, Jos. Woodward and Agnes D. Oliver, children of my first wife, the proceeds of the sale of land in Tennessee lately bought by me that may remain there and uncollected at the time of my decease."

In a codicil to the will appears the following:

"In section XIII respecting Tennessee lands, I refer solely to the unpaid purchase money at this time, not intending to include payment of $1,000 received by me in other property, and which property is disposed of in my general estate by other parts of this will. All other bequests except Tennessee lands to remain precisely as expressed in said (13) section."

The insistence is that complainants are estopped by these recitals in the will of Appollos Woodward, their ancestor, that Appollos Woodward did not own any other lands in Tennessee, and that the recitals must refer to this particular land. The testimony shows that only three or four counties have been looked to for records of other deeds to him, and, further, that

Daniel v. Coal & Iron Co.

his descendants did not know of any other land owned by him in Tennessee. This is not sufficiently conclusive as to whether he owned other lands in this State. Both he and Church were residents of Pennsylania. He may have owned other lands in Tennessee that his descendants did not know anything about. He died soon after the execution of his will, which was in 1857.

In the will of Appollos Woodward, he refers to land in Tennessee lately bought by him. It was twenty-four years after the execution of the deed by Jeremiah Church until the will was executed. It is not at all clear that he would be referring to this land as being lately bought by him when it had been twenty-four years since the purchase. Furthermore, the recitals do not show that Appollos Woodward had ever conveyed his Tennessee land. It does not show the name of any grantee. He may have sold the land, intending only to execute a deed in the event the purchaser paid the purchase price, which he indicates was not paid. If a parol sale was made by Appollos Woodward of these particular lands the action of his heirs in setting up claim thereto in this suit is sufficient renunciation of the parol sale, which is voidable. *Vaughn* v. *Vaughn*, 100 Tenn., 285, 45 S. W., 677.

But if it be conceded that the will can only have reference to this particular land, there is nothing therein stated which will estop these complainants from asserting title under the well known rules of estoppel. The defendant did not act upon the faith of these recitals in the will in any way; it did not purchase any

claim to the land on the faith of these statements, and is not prejudiced thereby. It is an entire stranger to, and is neither a party or privy, and can be neither bound nor aided by, the instrument or any representations therein. So no element of estoppel can arise in favor of defendant. Pomeroy's Eq. Jur., sec. 813; *Smith* v. *Cross,* 125 Tenn., 159, 140 S. W., 1060; *Tate* v. *Tate,* 126 Tenn., 171, 148 S. W., 1042.

The recitations in the will, therefore, are entirely too meager and uncertain to establish a conveyance of the land, or to prevent the heirs by estoppel from asserting title in ejectment.

Another assignment of error is that no recovery can be had, because this title was vested under the will of Appollos Woodward in his executors. The language of the will upon this subject relied upon for this position of defendant is as follows:

"I hereby authorize and empower my executors, or the survivor of them, to sell and convey all the rest and residue of my real estate wherever situated not hereinbefore specifically devised, at such time and on such terms and conditions as they may think most advantageous to those interested, and to execute and deliver to the purchaser deed conveying same in fee simple."

This is but a power of sale in the executors. It is not a devise to the executors. The distinction is clearly drawn in a number of our Tennessee authorities upon the subject, and especially is it well settled in *Rogers* v. *Marker,* 12 Heisk., 645, that there is a distinction be-

tween a devise to executors to sell and a power of sale. A power in the executors to convey land does not necessarily require that the title be vested in them for that purpose, and there is no attempt in the clause of the will above copied to vest an estate in the executors. It is well settled in *Rogers* v. *Marker,* that:

"A devise to executors to sell vests title; but a devise that the executors shall sell land, or that it shall be sold by them, gives but a power to sell."

The last assignment of error relied upon is as to the sufficiency of certain inclosures and improvements to effect a bar of the statute of limitations against complainants. One inclosure relied upon by the defendant, and maintained by it for a period of over seven years, was a small pen in the woods, about thirty-five by forty feet in dimensions, which was never cleared or cultivated. This might be termed an illusory possession. The owner of the land, observing it, might reasonably conclude that it was a stock pen used by some person grazing stock upon the land, without intention of claiming title. It is not a use and occupation of the land, such as should be required in order to take land from one person under the statute and give it to another.

It is well settled in this State that to effect a bar of the statute there must be some use and occupation of the land which will indicate an intention by some one to use the land as an owner. To indicate this it should be some use of which, from the nature and character of the land, it is reasonably susceptible, and this should

be obvious, open, and notorious. *King* v. *Mabry,* 3 Lea, 241; *Coal Co.* v. *Coppinger,* 95 Tenn., 526, 32 S. W., 465.

Another possession relied upon is within the boundary of a tract of land owned or claimed by the defendant, which interlaps with the Church grant; but the inclosure is not within the interlap. Defendant's claim within the interlap being inferior, such possession clearly would not be adverse to complainants.

Another possession is within the interlap, but is on a tract of land which is an older and superior title to the Jeremiah Church tract, and. hence cannot be adverse to the title held under the Church grant.

Another inclosure relied upon consisted of some five or six acres of an inclosure which extended over the line of a ten-acre tract. This ten-acre tract is called the Pat Schoolfield tract, and is a superior title to the Church grant. One John King purchased the ten acres and built a house and inclosed some land; part of the inclosure being within his ten acres, but a portion of same, consisting of about five or six acres, extending over the line. It is shown that this inclosure over the line was maintained for over seven years, but the proof is not clear that it was held and claimed as a possession for the Dayton Coal & Iron. Company. On the contrary, it distinctly appears that it was not relied upon by the company as a possession for it. There is some proof introduced tending to show that a surveyor named Schenck, working for the Dayton Coal· & Iron Company, had a conversation with King about the time

the latter constructed this inclosure, agreeing that he might do so, and that King should also look after other lands of the company in that vicinity. However, this testimony is not without serious doubt.

The proof indicates that at a later date, after Schenck had ceased to be an employee of the Dayton Coal & Iron Company, another man, looking after the land of the company, discovered the inclosure of King over his line, and objected to it, and demanded of King that he draw in his fencing, so that none of it would be upon the land of the Dayton Coal & Iron Company. King complied with this demand and drew in his inclosures. In doing so, however, he still left something like one-half an acre of the inclosure across the line, and his house was also over the line. At a later date it appears that the Dayton Coal & Iron Company brought suit against King and other defendants, alleging that they were trespassing upon the land and adversely in possession thereof, seeking to eject them and to enjoin the cutting of timber and other trespasses. King left the place about this time.

From the whole proof we are satisfied that the Dayton Coal & Iron Company did not for a sufficient time recognize King as its tenant, or rely upon his inclosure across the line under any lease or tenancy with it. Whatever may have been the understanding with Schenck, it is not clear that the officers and agents of the company relied upon any agreement that Schenck had made creating a lease or tenancy of this land. Moreover, it is not clear that any particular portion

of land was intended to be held by King for the Dayton Coal & Iron Company, and from the nature of the inclosure and the attendant circumstances, considering the unsatisfactory nature of the proof, we are unable to say that there was sufficient notoriety to this holding.

For the reasons here indicated, and others that might be mentioned, we hold that there was no sufficient adverse possession of this land by the Dayton Coal & Iron Company, or in its behalf, to bar the title of the true owners. There is, upon the whole case, no reversible error.

The decree of the chancellor will be affirmed in all respects.