FILED

03/25/2022

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 20, 2022 Session

## ESTATE OF MARY BELL MCGRAW MARLIN v. HARRY WHITEHEAD MARLIN, III, ET AL.

Appeal from the Probate Court for Rutherford County
No. 75PR1-2019-PR-309    Tolbert Gilley, Judge

_____

No. M2021-00059-COA-R3-CV

_____

This appeal concerns the interpretation of a will. Mary Bell McGraw Marlin ("Decedent")[1], a property owner in Rutherford County, left her farm to her surviving children. Decedent's holographic will provided equal acres to each heir, although a survey purporting to show how to divide the land was missing. After years of futile discussions over how to divide the farm, Decedent's grandson Harry Marlin, III filed suit in chancery court seeking to partition the land. The matter was referred to the Probate Court for Rutherford County ("the Probate Court"). After a hearing, the Probate Court entered an order dividing the land amongst the heirs. Harry Marlin, III appeals. He argues that the Probate Court erred by dividing the land into equal acres without regard to the economic value of the respective tracts. We hold, *inter alia*, that Decedent's will controls and it provided for equal acres, not equally valued acres. We further find that the evidence does not preponderate against the Probate Court's determination as to which tract each heir was to receive. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Michael B. Schwegler, Nashville, Tennessee, for the appellant, Harry Whitehead Marlin, III.

_____

[1] In the record, both "Bell" and "Belle" are used variously as part of Decedent's name.

J. Lynn Watson, Murfreesboro, Tennessee, for the appellees, Alyssa Marlin Pendergrast and Susan Marlin Bolin.[2]

Rodney M. Scott, Murfreesboro, Tennessee, for the appellee, Raleigh William Marlin.

George H. White, Murfreesboro, Tennessee, for the appellees, Linda Lynch West and the Estate of Mary McGraw Marlin.[3]

**OPINION**

## Background

Decedent died in 2001. The Marlin Farm at issue dates to the early 19th century. In 1975, Decedent made a will along with her husband Harry Marlin, Sr., which provided in part:

> In the event that our deaths should occur simultaneously or approximately so, or in the same common accident or calamity, or under any circumstances causing doubt as to which of us survives the Other, then we hereby give, bequeath and devise all of our property, real, personal or mixed, and wherever located, to our four children, Harry Marlin, Jr., Mrs. Linda Marlin Lynch, Raleigh W. Marlin, and Hoyt S. Marlin, equally, share and share alike; that is, each is to take a one-fourth (1/4) thereof….

Harry Marlin, Sr. died in 1983. In 2000, Decedent wrote a holographic will, later determined to constitute a codicil to her 1975 will. As relevant, Decedent stated that her farm property was to be "divided in equal acres according to the division I have indicated on the survey." However, there was no survey with the document. The beneficiaries of the holographic will were Decedent's surviving children: Raleigh Marlin, Linda Lynch West, and Harry Marlin, Jr. Harry Marlin, Jr. died in 2016; his successors in interest are Harry Marlin, III, Alyssa Marlin Pendergrast, and Susan Marlin Bolin (another successor, Vivian Davis, sold her interest to Raleigh Marlin and is not an active party on appeal). Decedent's will was admitted to probate in 2002. Linda Lynch West is Executrix of Decedent's estate. Decedent's will was closed without prejudice in 2016. For many years, the heirs had discussions to no avail regarding how to divide the property Decedent had left to them.

---

[2] Although in the posture of appellees, these siblings of appellant Harry Marlin, III filed a brief on appeal aligning themselves with Harry Marlin, III's position.

[3] We note Ms. West's first name is spelled variously "Linda" or "Lynda" in the record, although the former appears to be the predominant spelling.

In November 2017, Harry Marlin, III filed suit in the Chancery Court for Rutherford County ("the Chancery Court") requesting partition of Decedent's land. The Chancery Court referred the matter to the Probate Court. The Chancery Court also appointed William H. Huddleston, IV, Johnny M. Sullivan, and Carl Montgomery ("the Commissioners") to administer partition of the property. Decedent's estate thus was re-opened. Letters testamentary were issued to Linda Lynch West.

Raleigh Marlin moved the Probate Court to incorporate into Decedent's 2000 holographic will a survey obtained by Decedent in 1996 ("the 1996 Survey"). The Probate Court declined to incorporate the 1996 Survey into Decedent's will. However, the Probate Court did not exclude consideration of the 1996 Survey for purposes of interpreting Decedent's intent. Harry Marlin, III and his siblings contend that the 1996 Survey should not have been relied upon at all. They contend the 1996 Survey is incomplete because, among other things, it does not describe the 54 acre tract south of Blankenship Road that is 25 or 26 percent of the farm property. What is more, according to these parties, the Probate Court erred in directing the Commissioners to divide the farm land into three equal acreages without regard to the value of each tract. In support of their argument that value should have been considered, Harry Marlin, III and his siblings cite to the following partition statute, among other authorities:

> In making partition, the commissioners shall divide the premises and allot the several shares to the respective parties, quality and quantity relatively considered, according to the respective rights and interests of the parties as adjudged by the court, designating the several shares by posts, stones, marked trees, or other permanent monuments; and they may employ a surveyor, with the necessary assistants, to aid therein. The partition may be made by tracts, or by the division of each tract into shares, as may seem right to the commissioners and the court.

Tenn. Code Ann. § 29-27-116 (2012). In addition, these parties also cite the following statute:

> If the commissioners are satisfied that exact partition cannot be made without material injury to the parties, or some one of them, they may make the partition as nearly equal as they can, and charge the larger shares with the sums necessary to equalize all the shares, and report the facts.

Tenn. Code Ann. § 29-27-117 (2012).

On the other hand, Linda Lynch West and Raleigh Marlin contend that the 1996 Survey was just one of multiple pieces of evidence relied upon by the Commissioners.

They assert further that Decedent's will provided for equal acres, not equally valued acres. According to Linda Lynch West and Raleigh Marlin, dividing the land based upon value would be to alter Decedent's will and go against her testamentary intent.

In December 2020, a hearing was conducted before the Probate Court. Among the witnesses to testify was William H. Huddleston, IV, one of the Commissioners. Regarding the Commissioners' work, he stated:

> Q. Okay. Mr. Huddleston, I think you talked about what are some of the objectives you had when you were dividing the property, the three tracts?
> A. Correct.
> Q. I think you said you looked for road frontage?
> A. Correct.
> Q. And then suitable soil sites. Is there anything else you looked at?
> A. I wanted to make sure there weren't any drainage considerations that needed to be taken into account.
> Q. Could you explain just to a layperson what that means?
> A. Well, if we had divided -- if we had proposed to divide the farm into three tracts and one of them had a very large drainage base and it wouldn't drain, we wouldn't want to encumber one tract of that.
> Q. Did you find anything like that?
> A. We did not find anything in that regard.
> Q. Okay. And so if I look at the tracts that you've placed on both the first and second survey, these are all tracts that would divide the property equally but give it road frontage on Manchester and then suitable soil sites for both?
> A. Correct, for all three.
>
> ***
>
> Q. Okay. I've never been out to the property. Is there any characteristics of any of the three tracts that substantially differ from one to the other or is it all pretty much the same?
> A. Not to my knowledge. It does sort of vary. There's some open pieces and there's some run-up pieces as part of the tract, yeah.
> Q. Would that change the use or the value or change the characteristics of that property?
> A. Not in my opinion, especially in terms of development.
> Q. Okay. Would you say that, of the three tracts, are all of these roughly the same value under what you would say, same characteristics? Same road frontage? Same soil?
> A. From an engineering standpoint, yes.

-4-

Q. Okay. And changing the lines here or there wouldn't make much difference in your opinion?
A. Not if we change minimally. If we cut off somebody's access to Manchester Highway by changing the lines, I think that would affect the tract.

Johnny M. Sullivan, another Commissioner, testified as well:

Q. Mr. Sullivan, you said one of your objectives was to make sure that each of these tracts are as marketable as possible. Do you feel like each of the tracts are marketable?
A. I think so, yes. Again, we tried to equalize the soil as best we could without having a soil analysis completed by a professional. We did the best we could with the data that we had.
Q. And I know you didn't do an appraisal but --
A. That's correct.
Q. -- when you look at marketability, you're looking at fair market value. So you believe that these tracts each would have some marketability --
A. They would be marketable, yes.
Q. -- for potential buyers?
A. And, again, I did not study -- the focus again was the acreage, not the value of the acreage. So my focus was that. But if I had completed that assignment, that would take a whole other aspect of my profession.
Q. Is there anything about the three tracts in your mind that causes one to be a better tract or maybe one -- or a worst tract? Are there characteristics you can identify?
A. Mr. Watson, I hate to keep saying it, but that really wasn't our mission. Our mission was acreage….

Linda Lynch West, Executrix of Decedent's estate, also testified. She stated, in relevant part:

Q. Okay. So I'll hand you a series of -- they're not surveys. They're property assessor maps that -- or parts the property assessor maps that you previously have testified were found with your mother's belongings, papers; is that correct?
A. Correct, correct.
Q. And, in looking at those going one by one, tell the Court what they show as the terms of division of the property.

A. Okay. The first one that I'm looking at shows 54.02 acres plus 20.28 acres equally 74.80 acres. The same amount for my section and Harry's section equals the 54, which includes the 6.27 acres.

THE COURT: For the court reporter's benefit, when you're saying your section, you're the middle section?

THE WITNESS: Right.

THE COURT: Harry is the far left of the page?

THE WITNESS: Right.

THE COURT: And then Raleigh is the far right where this house is?

THE WITNESS: Right.

BY MR. WHITE:

Q. And the significance of the 54.02 acres is, that's the entire farm that lies to the south and west of Blankenship Road?

A. Correct.

Q. That makes no exclusion?

A. No.

Q. For the 6 acres previously deeded to Raleigh?

A. True. And out of one of every copy of these has the same 54.02 acres and a certain number of acres across Blankenship Road to equal the same total as the other two sections.

***

Q. Okay. A couple questions. First, the 54.02 acres is consistent on those documents as being the part allocated to Raleigh?

A. Yes.

Q. Okay. And I'm not sure -- excuse me. When did you discover those drawings?

A. When I went out -- after mother had passed way, I went out to the house and collected the things that she had that I thought was important to help settle the estate.

Q. And so those were --

A. In her possession, in her house, and made before her death, yes.

In December 2020, the Probate Court entered an order regarding the division of Decedent's real property into three tracts. In its order, the Probate Court found as follows:

In this cause a hearing was held on December 1, 2020, at which time the Court heard the testimony of the Commissioners, William H. Huddleston, IV, Johnny M. Sullivan and Carl Montgomery, as to the proposed division of the farm of Mary McGraw Marlin into three (3) shares of equal acres

pursuant to the terms of her Last Will and Testament and the Instructions To Commissioners previously ordered and filed in this cause on February 12, 2020, and based on the testimony of the Commissioners, the witnesses heard in open court, the statements of counsel and the entire record in this cause, including the Last Will and Testament of Harry W. Marlin, Sr. and Mary M. Marlin filed in Will Book 15, page 508, Rutherford County Clerk's Office, the Court found as follows:

1. Pursuant to the Instructions For Commissioners filed in this cause the Commissioners have made a division of the Marlin Farm of 221.34 acres, more or less, into three (3) tracts of equal acres (73.78 acres, more or less).

2. That in making their division the Commissioners did not have to consider the value of the Property because the Will of the Decedent stated in plain terms that the farm be divided into tracts of equal acres and not equal value;

3. That in making this division the three (3) Commissioners, who are three of the very best in their field, have unanimously and consistently testified as to the fair division of the farm, not just in acreage, but for some other tangibles and intangibles on the property;

4. That the drawings submitted at a previous hearing and discussed and reviewed at this hearing were probably prepared by Harry Marlin, Jr. and show that he wanted the Property to be divided into three (3) tracts with Harry marking off to himself the tract to the left, the same section the Commissioners found for him;

5. That the Commissioners submitted two (2) Property Surveys for the Marlin Estate marked as Exhibits 1 and 2 to the testimony of Commissioner Huddleston;

6. That Exhibit 1 divided the Farm into three (3) tracts of 73.78 acres each and included the 6.27 acre tract given to Raleigh Marlin by Quitclaim Deed in 1995, as a part of his 73.78 acre tract;

7. That Exhibit 2 divided the Farm into three (3) trac[t]s of 71.73 acres each that excluded the 6.27 acre tract deeded to Raleigh Marlin in 1995;

8. That the handwritten Will of the Decedent did not revoke prior Wills or Codicils made by her;

9. That the Last Will and Testament of Harry W. Marlin, Sr. and wife, Mary M. Marlin written by Mr. Todd in 1975, filed for probate in this court on April 26, 1983, in Will Book 15, page 508, a certified copy of which was found in the file in this cause states in Article II that "However, we have before made gifts to certain of our children, and we may made additional gifts to them "...of which a quitclaim deed would certainly be a record..." which will be found in our personal books and records. We hereby direct that all such gifts shall be considered as advances and shall be charged

without interest against our respective children who have received gifts, at the value of such gifts at the time they were made, which gifts shall be deducted from the bequests and devises herein given to such children respectively";

10. That because the handwritten Will of the Decedent did not revoke the above prior language in her previous joint Will[,] the handwritten Will is found to be a Codicil to the '75 Todd Will;

11. That based on the language in the Todd Will the intent of the Decedent always did mean for the 6.27 acres to be considered as a credit on an advance;

12. That the provisions of this prior joint Will, should apply to the division of the farmland set for in the holographic Will of the Decedent and therefore, the 6.27 acre tract given to Raleigh Marlin in 1995 should be treated as an advancement to him and included as part of his division of the Property under the Decedent's Will as described on Exhibit 1;

13. That once the three (3) Tracts have been properly surveyed and staked, Linda Lynch West, as Executrix of the Estate should be authorized to execute special warranty deeds divesting all of the right, title and interest, legal and equitable, of Linda Lynch West, Raleigh William Marlin and Harry Whitehead Marlin, III, Alyssa Marlin Pendergrast and Susan Marlin Bolin, in and to the Marlin Farm of 221.34 acres, more or less, and vesting same as follows:

a. The Tract on the left of 73.78 acres, more or less, shall be vested in: Raleigh William Marlin, Harry Whitehead Marlin, III, Alyssa Marlin Pendergrast and Susan Marlin Bolin;

b. The Tract in the middle of 73.78 acres, more or less, shall be vested in Linda Lynch West; and

c. The Tract on the right of 73.78 acres, more or less, shall be vested in Raleigh William Marlin[.]

14. That the fees of the Commissioners and the cost of this cause shall be paid by the Executrix as an expense of the Estate of the Decedent.

IT IS ACCORDINGLY, Ordered, Adjudged and decreed as follows:

1. That the Marlin Farm property shall be divided into three (3) tracts of equal acres of 73.78 acres each according to the "Preliminary Survey" of Huddleston Steele, Inc. marked as Exhibit 1 and attached to this Order;

2. That upon completion of the metes and bounds description dividing the Marlin Farm into three (3) tracts, Linda Lynch West, as Executrix of the Estate of Mary McGraw Marlin, is authorized and ordered to execute Special Warranty deeds divesting all of the right, title, and interest, legal and equitable, of the Estate and of Linda Lynch West, Raleigh William Marlin, Harry Whitehead Marlin, III, Alyssa Marlin Pendergrast and Susan Marlin

-8-

Bolin in and to the Marlin Farm of 221.34 acres, more or less, as described on Exhibit "1" to this Order and vesting all of said right, title and interest, legal and equitable, as follows:

       a. As to the Tract on the left on Exhibit 1 (73.78 acres, more or less) title shall be conveyed to and shall be vested in Raleigh William Marlin, Harry Whitehead Marlin, III, Alyssa Marlin Pendergrast and Susan Marlin Bolin, their heirs, successors and assigns;

       b. As to the Tract in the middle on Exhibit 1 (73.78 acres, more or less) title shall be conveyed to and shall be vested in Linda Lynch West, her heirs, successors and assigns;

       c. As to the Tract on the right on Exhibit 1 (73.78 acres, more or less) title shall be conveyed to and shall be vested in Raleigh William Marlin, his heirs, successors and assigns;

3. The Executrix of the Estate is authorized to pay from the Estate all survey related expenses incurred for the division of the Marlin Farm;

4. The Executrix of the Estate is ordered to pay from the Estate the fees of the Commissioners in such amounts as approved by the Court;

5. The Executrix of the Estate is ordered to pay from the Estate all deed preparation and recording fees necessary to complete the division of the Marlin Farm and vest title in the parties as set forth in this Order;

6. The Executrix of the Estate is ordered to pay from the Estate the court reporters fee and costs for her services incurred at the hearing of this matter; and

7. The costs of this cause are taxed to the Estate of Mary McGraw Marlin.

The Probate Court also entered an order approving the Commissioners' fees. Harry Marlin, III appealed to this Court. An issue remained outstanding as Raleigh Marlin moved for further partition, requesting "that the same Commissioners engaged by this Honorable Court to divide the portion of the Marlin farm House & Acreage tract and the remaining farm tract, also be appointed to divide the aforesaid 1/3 'Left Tract' portion of the original Marlin farm.'" However, Raleigh Marlin later sought dismissal without prejudice so as to allow this appeal to proceed. The Probate Court entered an order dismissing without prejudice Raleigh Marlin's motion for further partition.

## Discussion

We restate and reorder Harry Marlin, III's issues on appeal as follows: 1) whether the Probate Court erred by failing to comply with the partition statutes; 2) whether the Probate Court erred in interpreting Decedent's will to provide equal acres without regard to the economic value of each tract; and 3) whether the Probate Court erred in relying on

the contents of any document in evaluating the testator's intent and creating rules for the Commissioners retained to create a new survey. Linda Lynch West and Raleigh Marlin raise a separate issue of whether Harry Marlin, III's appeal is frivolous.

We first address whether the Probate Court erred by failing to comply with the partition statutes. Harry Marlin, III and his siblings argue that this is a partition case. The partition statutes are found at Tenn. Code Ann. § 29-27-101, *et seq*. Harry Marlin, III relies in particular upon §§ 29-27-116 and -117 concerning the quality and relative equality of partition. At oral arguments, counsel for Harry Marlin, III made the point that if this is not a partition case, it is unclear why commissioners were appointed in the first place. In response, Raleigh Marlin and Linda Lynch West argue that this is not a partition case at all. They contend, instead, that this is a will construction case.

A 1950 case by the Tennessee Supreme Court is instructive on this question. In *Stooksbury v. Pratt*, 234 S.W.2d 845 (Tenn. 1950), the decedent therein executed a will directing his executor to "sell all of my real and personal property, at public or private sale as he may think best, and after paying all of my just debts, I direct that he pay the balance in my estate to my children, share and share alike." Notwithstanding this provision, a son of decedent filed suit seeking to partition decedent's land. *Id*. at 845-46. The trial court concluded the son could not maintain his partition suit. *Id*. at 846. On appeal, the Tennessee Supreme Court affirmed the trial court. *Id*. Our Supreme Court explained as follows:

> Appellant relies upon *Rogers v. Marker*, 59 Tenn. 645 [(Tenn. 1874)]; *Daniel v. Dayton Coal and Iron Co.*, 132 Tenn. 501, 178 S.W. 1187 [(Tenn. 1915)], and *Fowler v. Plunk*, 7 Tenn.App. 29 [(Tenn. Ct. App. 1928)]. It is held in those cases that where there is a mere testamentary direction for the named executor to sell the land for division of proceeds after payment of debts the title to the land is in the testamentary beneficiaries rather than the executor; or, as *Fowler v. Plunk*, *supra*, puts it "the title is in the beneficiary or heir *until the sale*". (Emphasis supplied.)
>
> *Rogers v. Marker*, and *Daniel v. Dayton Coal and Iron Co.*, *supra*, involved the question of the right of possession, while *Fowler v. Plunk* dealt with the question of whether the interest given by the will to the beneficiaries could be levied upon by a judgment creditor or conveyed by the deed of beneficiary. There is not involved in either of those cases the question of whether Code section 9165 [a predecessor to Tenn. Code Ann. § 29-27-101] may be allowed to defeat the testator's clear intention and positive direction that his executor sell his land, pay his debts, and distribute the balance to designated persons.

Nor is there anything in Code section 9165, the partition statute[,] that gives or purports to give to a beneficiary under the will the right to deprive an owner of land the power to provide an inexpensive and expedient way of selling his land for these legally permissible purposes. In order to vest that power in an executor it is not necessary that the will vest title in him. *Daniel v. Dayton Coal and Iron Co.*, *supra*, 132 Tenn. at page 509, 178 Tenn. 1187.

It would seem, therefore, on principle that this son should not be allowed within about a year after the death of his father, and about a month after the death of his mother, to defeat this clear and important provision of his father's will by invoking Code section 9165.

On authority, as well as on principle, the question for decision here seems to have been conclusively determined adversely to this appellant in our case of *Barton v. Cannon*, 66 Tenn. 398, 399, 401-402 [(Tenn. 1874)]. In that case the will provided that the executor, after the death of the widow, sell the land of the testator and divide the proceeds equally between designated beneficiaries. As in the case at bar, a partition suit was attempted under code section 9165, then 3262 by some of the beneficiaries, or the purchasers of their shares. The Court held that because of the above mentioned provision of this will such partition suit could not be maintained by these beneficiaries.

*Stooksbury*, 234 S.W.2d at 846.

The relevant lesson from *Stooksbury* is that the partition statutes may not be used to defeat a testator's intent. In the present case, Decedent died with a valid will; she did not die intestate. If she had, adherence to the partition statutes could well be an issue. As Decedent died with a valid will, her intentions may not be circumvented by recourse to the partition statutes. There appeared to be some uncertainty below as to how to characterize this case. At one point, the Probate Court stated the following in court:

THE COURT: Okay. A couple of things we need to address. And, Mr. White [counsel for the Executrix], you know, you had asked again did I wish the partition suit was here, not that I look for extra work, but, basically, given the testimony we've had, we've all but had the equivalent of, except for valuation, a partition suit today, which is really the answer, I think, for most of these people. The ultimate outcome that they're looking for is how that would turn out.

The Probate Court was correct in that this case shares certain features of a partition case—namely, in that it involves the division of a piece of land. However, similarities notwithstanding, this is not a partition case. This is a will construction case. In his brief, Harry Marlin, III states: "No person's last will and testament can overcome a statute[.]" That is true enough as it goes, but the partition statute is inapplicable. Decedent was under no legal obligation to leave her heirs equally valuable pieces of land. If Decedent wished, she could have awarded prime land to one or two children, and barren land to another child. Decedent's intent is what matters. We hold that the Probate Court did not err by failing to comply with the partition statutes as these statutes are inapplicable here.

We next address whether the Probate Court erred in interpreting Decedent's will to provide equal acres without regard to the economic value of each tract. With respect to will construction, this Court has stated:

> The construction of a will is a question of law for the court; therefore, we review the trial court's conclusions of law *de novo* affording them no presumption of correctness. *In re Estate of Milam*, 181 S.W.3d 344, 353 (Tenn. Ct. App. 2005). In cases involving the construction of wills, the cardinal rule "is that the court shall seek to discover the intention of the testator, and will give effect to [that intent] unless it contravenes some rule of law or public policy." *Stickley v. Carmichael*, 850 S.W.2d 127, 132 (Tenn. 1992) (quoting *Bell v. Shannon*, 212 Tenn. 28, 367 S.W.2d 761, 766 (Tenn. 1963)); *see also In re Crowell*, 154 S.W.3d 556, 559 (Tenn. Ct. App. 2004); *McBride v. Sumrow*, 181 S.W.3d 666, 669 (Tenn. Ct. App. 2005). Furthermore, in will construction cases, we rely on the language of the instrument to determine the testator's intent:
>
>> [T]he testator's intention must be ascertained from "that which he has written" in the will, and not from what he "may be supposed to have intended to do," and extrinsic evidence of the condition, situation and surroundings of the testator himself may be considered only as aids in the interpretation of the language used by the testator, and "the testator's intention must ultimately be determined from the language of the instrument weighed in the light of the testator's surroundings, and no proof, however conclusive in its nature, can be admitted with a view of setting up an intention not justified by the language of the writing itself."
>
> *In re Cromwell*, 154 S.W.3d at 559 (quoting *Nichols v. Todd*, 20 Tenn.App. 564, 101 S.W.2d 486, 490 (Tenn. Ct. App. 1936)); *see also* Pritchard on

Wills §§ 384, 387, 388, and 409 (2d. ed.). Our Supreme Court has said that when ascertaining the testator's intent by construing the language used in a will, we must consider the entire will as a whole. *In re Estate of Vincent*, 98 S.W.3d 146, 150 (Tenn. 2003).

*Horadam v. Stewart*, No. M2007-00046-COA-R3-CV, 2008 WL 4491744, at *5 (Tenn. Ct. App. Oct. 6, 2008), *R. 11 perm. app. denied April 27, 2009*. In addition, "[a] will should be construed to give effect to every word and clause contained therein." *Presley v. Hanks*, 782 S.W.2d 482, 489 (Tenn. Ct. App. 1989) (citing *Bell v. Shannon*, 212 Tenn. 28, 367 S.W.2d 761 (Tenn. 1963)); *see also In re Martin*, No. E2011-02693-COA-R3-CV, 2013 WL 125931, at *2-4 (Tenn. Ct. App. Jan. 10, 2013), *no appl. perm. appeal filed* (applying the aforementioned authorities in a will interpretation case).

In *Horadam*, this Court stated further:

> An ambiguity is "[a]n uncertainty of meaning or intention, as in a contractual term or statutory provision." Black's Law Dictionary 88 (8th ed. 2004). Generally, parol or extrinsic evidence may not be used to vary, contradict, or add to unambiguous language used in a will, "although it is admissible to explain a latent ambiguity." *Stickley* [*v. Carmichael*], 850 S.W.2d at [127,] 132 [(Tenn. 1992)] (citing *Fariss v. Bry-Block Co., Inc.*, 208 Tenn. 482, 346 S.W.2d 705 (Tenn. 1961)); *see also In re Estate of Eden*, 99 S.W.3d 82, 93 (Tenn. Ct. App. 1995). After reviewing the Will, we agree with the trial court that an ambiguity exists; however, we have determined that the ambiguity is latent, rather than patent, for which extrinsic evidence is permitted.

> We first note that, to the extent the parol evidence rule is exclusionary, it does not prevent courts from hearing parol testimony that allows them to "put themselves as near as possible in the situation of the makers of the wills whose language is to be interpreted[.]" *Treanor v. Treanor*, 25 Tenn.App. 133, 152 S.W.2d 1038, 1041 (Tenn. Ct. App. 1941). For example, extrinsic evidence that shows "the state of facts under which the wills were made, the situation of the properties of the testators, the members of their families and other relevant or cognate facts[,]" may be considered regardless of ambiguity classification. *Id*. (quoting *Cannon v. Ewin*, 18 Tenn.App. 388, 77 S.W.2d 990, 992 (Tenn. Ct. App. 1934)). Thus, Ms. Norton's relationship to and history with the parties, as well as any inter vivos transfers of her property, are important considerations to help us understand her intent in executing the Will.

***

Simply defined, a latent ambiguity is "[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." Black's Law Dictionary 88 (8th ed. 2004). Latent ambiguities most often arise in relation to the person and the thing identified in the document and "exist when the words of a written instrument are plain and intelligible, yet have capability of multiple meanings given extraneous facts." *Hargis v. Fuller*, No. M2003-02691-COA-R3-CV, 2005 WL 292346, *6 (Tenn. Ct. App. Feb. 7, 2005) (citing 96 C.J.S. *Wills* § 893 (2001)). For example, a latent ambiguity regarding the subject or thing would arise if a testator devises a parcel of his property "X" but has two parcels, "North X" and "South X." *Id*. Extrinsic evidence is then admissible to identify the property or person the testator intended to describe. *See Holmes v. Roddy*, 176 Tenn. 624, 144 S.W.2d 788, 789 (Tenn. 1940).

Alternatively, a patent ambiguity exists when the ambiguity results from the language or wording in the instrument….

*Horadam*, 2008 WL 4491744, at *5-6.[4] *See also In re Will of Leitsinger*, 1993 WL 190916, at *2-3 (Tenn. Ct. App. June 4, 1993), *no appl. perm. appeal filed* (including as examples of extrinsic evidence a testator's prior wills and parol evidence of the circumstances surrounding the execution of the will).

The absence of the survey from Decedent's 2000 holographic will gives rise to a latent ambiguity. If the survey were attached thereto, this litigation may never have arisen as it would have been clear which heir was to receive which part of the property. As it happened, the survey is unavailable, and we are left with Decedent's stated wish that the farm land portion of the property be divided into "equal acres." Decedent's 2000 holographic will made no mention of equally valuable acres. Harry Marlin, III relies on the language of the 1975 will as indicative of Decedent's desire that her children "share and share alike." However, such reliance would render Decedent's 2000 holographic will meaningless. At oral arguments, counsel for Harry Marlin, III acknowledged that his interpretation of "equal acres" would essentially mean Decedent's 2000 holographic will was of no effect. However, we are to give effect to a testator's intent when possible, not interpret it as a nullity. Decedent could have used language concerning equal value, but she did not. Therefore, we will not read into Decedent's will a provision for equally valued

---

[4] In their brief, Linda Lynch West and Raleigh Marlin state that the applicable standard of review for this appeal is abuse of discretion. We find no support for that statement.

acres when no such language exists in the document. "Equal acres" contrasts with "share and share alike," and the former superseded the latter by its inclusion in Decedent's codicil.

Harry Marlin, III argues nevertheless that the land could be divided into tracts of equal acres *and* of equal value. However, this presumes without proof that Decedent's intent was to do so. Given the historic nature of the family farm, it is just as possible Decedent's intention in awarding tracts of equal acres was unrelated to a possible future sale of the tracts. In any event, Decedent's 2000 holographic will contains no language providing for equally valuable tracts; it only says equal acres. We hold, as did the Probate Court, that Decedent's will provided for equal acres only—not equally valuable acres.[5]

We next address whether the Probate Court erred in relying on the contents of any document in evaluating the testator's intent and creating rules for the Commissioners retained to create a new survey. "When … the testator's intent is determined by extrinsic evidence, the trial court's findings of fact regarding that evidence are reviewed *de novo* with a presumption of correctness." *In re Estate of Garrett*, No. M1999-01282-COA-R3-CV, 2001 WL 1216994, at *5 (Tenn. Ct. App. Oct. 12, 2001), *no appl. perm. appeal filed* (citations omitted). Harry Marlin, III takes issue especially with the Probate Court's consideration of the 1996 Survey. He states that the 1996 Survey is ambiguous; that it fails to describe the whole property; that it fails to divide the property into three tracts of equal acreage; that it incorrectly marks as Raleigh Marlin's property a parcel their parents had intended for Linda Lynch West; and that the only reason Decedent produced the 1996 Survey was to use it in case Decedent died while going on a trip with Linda Lynch West. Harry Marlin, III also asserts the doctrine of laches, arguing Raleigh Marlin waited an undue length of time before offering the 1996 Survey.

Harry Marlin, III correctly notes a number of deficiencies in the 1996 Survey. Indeed, the Probate Court declined to incorporate the 1996 Survey into Decedent's holographic will. However, the absent survey from Decedent's 2000 holographic will created a latent ambiguity. It was appropriate for the Probate Court to consider other evidence in order to interpret Decedent's intentions regarding which tract of equal acres would go to which heir. Toward this end, the doctrine of laches did not preclude evidence germane to interpreting Decedent's intent as expressed in her will. In addition, as Linda Lynch West and Raleigh Marlin point out, the 1996 Survey was but one of multiple pieces of evidence adduced at the hearing below. We find no reversible error in the Probate Court's limited consideration of the 1996 Survey nor in any of the evidence the Probate Court relied upon to resolve the latent ambiguity in Decedent's will. The record reflects

---

[5] It is not entirely clear from the record what is wrong with the land assigned to Harry Marlin, III and his sisters. At oral arguments, counsel for Harry Marlin, III referenced the amount of road frontage, nearby graveyards, and a floodplain as being problematic. Although the Commissioners did not appraise the tracts, the trial testimony reflects they endeavored to award viable tracts to each heir.

that the Probate Court did the best it could in light of the latent ambiguity to give effect to Decedent's intent.  The evidence does not preponderate against the Probate Court's determination as to which tract of equal acres each heir was to receive.[6]  We affirm the judgment of the Probate Court.

The final issue we address is Linda Lynch West and Raleigh Marlin's issue of whether Harry Marlin, III's appeal is frivolous.  " 'A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that [an appeal] can ever succeed.' " *Morton v. Morton*, 182 S.W.3d 821, 838 (Tenn. Ct. App. 2005) (quoting *Industrial Dev. Bd. of the City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995)) (other internal citations omitted).  In pertinent part, Tenn. Code Ann. § 27-1-122 (2017) addresses damages for frivolous appeals, stating:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Whether to award damages due to a frivolous appeal is a discretionary decision by the appellate court. *Young v. Barrow*, 130 S.W.3d 59, 66-67 (Tenn. Ct. App. 2003).  Although we have ruled against Harry Marlin, III, his arguments on appeal were coherent and sensible if, in the end, unconvincing.  In the exercise of our discretion, we decline to find Harry Marlin, III's appeal frivolous.

## Conclusion

The judgment of the Probate Court is affirmed, and this cause is remanded to the Probate Court for collection of the costs below.  The costs on appeal are assessed against the Appellant, Harry Whitehead Marlin, III, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

---

[6] To the extent the appointment of the Commissioners was erroneous in this, a non-partition case, we find any such error was harmless because the evidence does not preponderate against the Probate Court's ultimate decision regarding how to allocate the land.  In addition, Harry Marlin, III, Alyssa Marlin Pendergrast, and Susan Marlin Bolin do not point to any evidence tending to undercut the Commissioners' testimony.  They simply take issue with the fact the Commissioners were not tasked with determining the value of each tract, a fact we have held to be consistent with Decedent's will.